# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00324-COA

**MARY VIRGINIA HAMMOND**  APPELLANT

**v.**

**PERRY JOSEPH HAMMOND**  APPELLEE

DATE OF JUDGMENT:  03/05/2020
TRIAL JUDGE:  HON. SUSAN RHEA SHELDON
COURT FROM WHICH APPEALED:  MARION COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:  S. CHRISTOPHER FARRIS
ATTORNEY FOR APPELLEE:  ELIZABETH L. PORTER
NATURE OF THE CASE:  CIVIL - DOMESTIC RELATIONS
DISPOSITION:  REVERSED AND REMANDED - 09/14/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

## BEFORE WILSON, P.J., GREENLEE AND WESTBROOKS, JJ.

## WILSON, P.J., FOR THE COURT:

¶1.   Mary Virginia "Jenny" Hammond filed a complaint for divorce from Perry Hammond after twenty-five years of marriage. The chancellor granted Jenny a divorce on the ground of uncondoned adultery, granted her physical custody of the parties' minor child, divided the marital estate, and ordered Perry to pay rehabilitative alimony of $500 per month for two years. On appeal, Jenny argues that the chancellor erred by (1) failing to consider Perry's adultery when dividing the marital estate; (2) awarding grossly inadequate alimony; (3) requiring Perry to provide her with health insurance coverage for only a limited time; and (4) denying her request for attorney's fees. We hold that the chancellor erred by not considering Perry's adultery when dividing the marital estate and by awarding inadequate alimony. On

those grounds, we reverse and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶2. Jenny and Perry were high school sweethearts and married in 1991. Perry worked in the oilfield industry, and Jenny worked as a cosmetologist. In 1996, they had a son, and Jenny became a stay-at-home mom. Perry's job required him to work fourteen days "on" and fourteen days "off." During the fourteen days Perry was gone, Jenny was the sole caregiver for their child. In 2003, the parties had a daughter. Around this time, Perry began working a thirty-on-thirty-off schedule, meaning that he was gone for thirty days at a time, leaving Jenny as the sole caregiver for two children.

¶3. Jenny testified that she started to notice a lack of intimacy in the marriage and that Perry would sleep in the recliner in the living room instead of the bedroom when he was home. Jenny eventually discovered that Perry was having an affair while he was traveling for work. Jenny became depressed after she learned of Perry's adultery, and she testified that Perry's relationship with the children had suffered. Jenny testified that she had lost her hair as a result of her depression and that she started taking antidepressants. She testified that she still loved Perry but could not remain married to him. She filed for divorce in 2016.

¶4. Jenny said that Perry was the "best dad ever" prior to the breakdown of the marriage. Perry admitted that his relationships with his children had suffered, but he testified that they were on the mend. Perry testified that he had not felt appreciated in his marriage and that he felt like he was only good for a paycheck.

¶5. Jenny was forty-seven years old at the time of trial. She testified that although she

2

stopped working as a cosmetologist to stay home with her children, she had also developed a bulging disc in the mid-1990s. She testified that she had been seeing a doctor for her back since that time and that she would no longer be able to work as a cosmetologist. At the time of trial, she worked as a preschool assistant at Columbia Academy. She had started working at Columbia Academy in 2017 in an effort to provide for herself following her separation from Perry. Her job did not provide health insurance or retirement benefits. Jenny believed that it would cost her about $500 per month to obtain private health insurance. She testified that she could earn more if she were certified to teach, but she could not afford to return to college to pursue the necessary degree.

¶6. Jenny's Uniform Chancery Court Rule 8.05 financial statement reported gross monthly income of $710 and net monthly income of $646 from her job. Perry was also paying her $2,000 per month in temporary alimony. She reported monthly living expenses of $5,500, including the mortgage, taxes, and insurance on the marital home. Jenny also introduced a copy of her attorney's bill, and she testified that she could not afford to pay it. Perry did not object to or question Jenny about the bill.

¶7. Perry's Rule 8.05 statement reported gross monthly income of $19,539, net monthly income of $12,150, and monthly living expenses of $2,387. Perry's reported income did not include his annual performance bonus. Prior to trial in 2018, Perry had received an annual bonus of $67,938. Perry testified that the amount of his bonus was "not guaranteed" and depended on his performance, but he acknowledged that he had received a bonus each year for at least five years. Perry had been living in South Carolina with his father since the

3

separation. He had bank accounts with a combined balance of approximately $16,000 and retirement and investment accounts with a combined balance of more than $700,000.

¶8. The marital home and surrounding property had a mortgage of $52,000. The Hammonds also owned approximately twenty acres near the marital home and several pieces of farm equipment and older trucks that they used to maintain their property.

¶9. Perry proposed giving Jenny the marital home and surrounding five acres because it had belonged to her family. Perry also said Jenny should have the parties' sailboat, trucks, and farm equipment. Perry wanted to keep the separate twenty-acre tract near the marital home. He also wanted to keep as much of his retirement savings and investments as possible but was willing to use those accounts to address any disparity in the equitable division of the marital estate. Perry objected to paying any alimony. He argued that he had already paid temporary alimony for two years and that he had not "seen any effort" by Jenny "to improve herself to be sufficient -- self efficient (sic)."

¶10. The chancellor found that the date of demarcation for purposes of dividing the marital estate was the date of the temporary order (December 20, 2016). The chancellor then awarded Jenny 55% of the marital estate, including the marital home and five acres, all farm trucks and equipment, and all household items and personal property in her possession. She awarded Jenny her Toyota Highlander and ordered Perry to pay off the note on the vehicle. She awarded Jenny approximately $7,900 from Perry's bank accounts and approximately $202,500 from Perry's 401(k) account.

¶11. The chancellor awarded Perry 45% of the marital estate, including the remainder of

4

his 401(k) account[1] and bank accounts and his other investments. The chancellor also awarded Perry his truck, all personal property in his possession, and the twenty-acre tract of land he requested. The chancellor ordered Perry to pay the mortgage, taxes, and insurance on the marital home until the mortgage, which had a balance of approximately $52,000, was paid off. The chancellor also ordered Perry to pay the note, insurance, and taxes on Jenny's Toyota Highlander until the note was paid off. Finally, the chancellor ordered Perry to pay the remaining debt on Jenny's sailboat, which the chancellor found was Jenny's separate property because it had been a gift from Perry to Jenny.

¶12. The chancellor ordered Perry to pay $1,166.67 per month in child support plus the daughter's private school tuition, health and dental insurance, and uncovered health and dental expenses. The chancellor ordered Perry to pay Jenny rehabilitative alimony of $500 per month for twenty-four months and to maintain health insurance for Jenny for the same period of time. The chancellor denied Jenny's request for attorney's fees.

¶13. On appeal, Jenny raises four issues. First, she argues that the chancellor erred by failing to consider Perry's uncondoned adultery when determining an equitable division of the marital estate. Second, she argues that the chancellor's award of rehabilitative alimony was inadequate given the length of the parties' marriage and the disparity in their respective earning capacities. Third, she argues that the chancellor should have ordered Perry to pay for her health insurance for more than twenty-four months. Fourth, she argues that the

---

[1] Perry's 401(k) account had a balance of approximately $520,000 as of the date of demarcation. The balance had increased to $657,760 by the time of trial. The increase was treated as Perry's separate asset and was not subject to equitable division.

chancellor should have ordered Perry to pay her attorney's fees because she established that she was unable to pay them. For the reasons explained below, we conclude that the chancellor committed reversible error with respect to the first two issues, and we remand the case for further proceedings consistent with this opinion.

## ANALYSIS

¶14. "When reviewing a decision of a chancellor, this Court applies a limited abuse of discretion standard of review." *Mabus v. Mabus*, 890 So. 2d 806, 810 (¶14) (Miss. 2003). We will not disturb a chancellor's findings unless those findings are "manifestly wrong" or "clearly erroneous" or the chancellor "applied the wrong legal standard." *Id.* (quoting *McNeil v. Hester*, 753 So. 2d 1057, 1063 (¶21) (Miss. 2000)). This standard of review applies to the equitable division of the marital estate and the award of alimony and attorney's fees. *Layton v. Layton*, 181 So. 3d 275, 279-80 (¶10) (Miss. Ct. App. 2015). "Pure questions of law are reviewed de novo." *Id.* at 279 (¶10).

### I. Equitable Division

¶15. In *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994), our Supreme Court stated,

> [T]his Court directs the chancery courts to evaluate the division of marital assets by the following guidelines and to support their decisions with findings of fact and conclusions of law for purposes of appellate review. Although this listing is not exclusive, this Court suggests the chancery courts consider the following guidelines, where applicable, when attempting to effect an equitable division of marital property:
>
> 1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
>
>    a. Direct or indirect economic contribution to the acquisition of the property;

6

b.   Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and

c.   Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.

2.   The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.

3.   The market value and the emotional value of the assets subject to distribution.

4.   The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5.   Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6.   The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7.   The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8.   Any other factor which in equity should be considered.

*Id.* at 928. Under *Ferguson* factor 1(b), the Supreme Court has held that "marital misconduct is a viable factor entitled to be given weight by the chancellor when the misconduct places a burden on the stability and harmony of the marital and family relationship." *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009) (alteration omitted) (quoting *Carrow v. Carrow*, 642 So. 2d 901, 904-05 (Miss. 1994)). "The failure to consider all applicable

7

*Ferguson* factors is error and mandates reversal." *Id.* at 286 (¶29).

¶16. In this case, the evidence was uncontradicted that the parties' twenty-five-year marriage ended because of Perry's uncondoned adultery. There was no evidence of any marital misconduct or fault on Jenny's part. Perry admitted that during the marriage he began an affair with a woman he met while traveling for work in Indonesia. He also admitted that after the parties separated, he gave $10,000 to his paramour's cousin. He claimed that the cousin had loaned him the equivalent of $6,000 in Indonesian currency, which he and his paramour spent, but he had no evidence of the loan. He admitted that the remaining $4,000 was simply a gift to his paramour. Perry's adultery caused Jenny to become deeply depressed and ultimately led to the end of the marriage. In addition, Perry admitted that his adultery had affected his relationships with his children.

¶17. On appeal, Jenny argues that the chancellor erred by failing to consider Perry's adultery when making an equitable division of the marital estate. Indeed, the chancellor's *Ferguson* analysis does not mention Perry's affair. We agree that the chancellor's failure to consider this issue requires reversal.

¶18. As noted above, when applying the *Ferguson* factors, a chancellor is required to take into account a spouse's adulterous conduct to the extent that such "misconduct places a burden on the stability and harmony of the marital and family relationship." *Lowrey*, 25 So. 3d at 285 (¶26) (quoting *Carrow*, 642 So. 2d at 904-05). Furthermore, both the Supreme Court and this Court have held that it is reversible error for the chancellor to fail to consider such misconduct when dividing the marital estate. *Singley v. Singley*, 846 So. 2d 1004, 1009

8

(¶13) (Miss. 2002); *Watson v. Watson*, 882 So. 2d 96, 108-09 (¶¶67-68) (Miss. 2004); *Ellison v. Williams*, 282 So. 3d 447, 451 (¶¶11-12) (Miss. Ct. App. 2019) (holding that the chancellor committed reversible error by failing to consider the husband's adultery even though the wife "receive[d] a slightly larger portion of the marital estate"). In this case, the chancellor failed to consider Perry's adultery when dividing the marital estate. Therefore, we must reverse and remand for the chancellor to reconsider the division of the marital estate after giving appropriate weight to Perry's adultery and its impact on the parties' marriage.

## II.    Alimony

¶19.    Jenny argues that the chancellor erred in awarding only $12,000 in rehabilitative alimony—$500 per month for twenty-four months—given the parties' long marriage and the great disparity in their respective earning capacities. Jenny also points out that the chancellor erroneously stated that the marriage was a twenty-one-year marriage. The parties were actually married for twenty-five years prior to their separation in 2016. Finally, Jenny argues that there is no substantial evidence to support the chancellor's finding that Jenny is "employable and . . . capable of becoming self-supporting."

¶20.    After the marital estate is divided, an award of alimony should be considered if "the spouse seeking alimony is left 'with a deficit with respect to having sufficient resources and assets to meet his or her needs and living expenses.'" *Layton*, 181 So. 3d at 282 (¶17) (emphasis omitted) (quoting *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013)). If a party is left with a deficit, then the chancellor must consider the *Armstrong* factors, *see Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993), to determine

9

whether to award alimony and, if so, the amount and type of alimony to award. *Leblanc v. Leblanc*, 271 So. 3d 494, 505 (¶51) (Miss. Ct. App. 2018). The *Armstrong* factors are the following:

1. The income and expenses of the parties;

2. The health and earning capacities of the parties;

3. The needs of each party;

4. The obligations and assets of each party;

5. The length of the marriage;

6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay or personally provide child care;

7. The age of the parties;

8. The standard of living of the parties, both during the marriage and at the time of the support determination;

9. The tax consequences of the spousal support order;

10. Fault or misconduct;

11. Wasteful dissipation of assets by either party; or

12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Armstrong*, 618 So. 2d at 1280. Although "[t]he award of alimony and the amount of any such award is largely within the discretion of the chancellor," *Monroe v. Monroe*, 745 So. 2d 249, 252 (¶13) (Miss. 1999), we must reverse an award that is "so . . . grossly inadequate as to evidence an abuse of discretion." *Armstrong*, 618 So. 2d at 1280.

¶21.    Certain *Armstrong* factors are significant in this case.  First, "[a] significant disparity in earning capacity is a major factor in the determination of a periodic alimony award." *Davis v. Davis*, 832 So. 2d 492, 499 (¶23) (Miss. 2002).  Here, Perry reported gross monthly income of $19,539 and net monthly income of $12,150.  In addition, Perry's reported income did not include his annual performance bonus, which had been $67,938 in the year of the trial.  In contrast, Jenny had gross monthly income of $710 and net monthly income of $646 from her job as a teacher's assistant.  While Jenny might be able to earn somewhat more, she lacks a college degree, and there is no evidence that she could earn substantially more than she was earning at the time of trial.  Clearly, there is a significant disparity between Perry's earning capacity and Jenny's earning capacity.

¶22.    Second, the length of the parties' marriage "may be the most critical factor in determining whether a disparity [between the parties' incomes] should be remedied by alimony."  Deborah H. Bell, *Bell on Mississippi Family Law* § 9.04[5][a], at 291 (3d ed. 2021) ("[A]n analysis of Mississippi alimony awards reveals a distinct pattern of increasing size and length of awards in longer marriages."); *see also id.* at 292 ("A lengthy marriage is frequently the primary factor supporting an award of permanent alimony."); *accord Leblanc*, 271 So. 3d at 506 (¶59); *Serio v. Serio*, 203 So. 3d 24, 30-31 (¶18) (Miss. Ct. App. 2016).  Here, the parties were married for over twenty-five years prior to their separation, although the chancellor mistakenly stated that they had been married for only twenty-one years.  This clearly qualifies as "a long marriage in the context of this factor." *Rodrigue v. Rodrigue*, 172 So. 3d 1176, 1188 (¶44) (Miss. Ct. App. 2014) (twenty-three-year marriage); *accord Leblanc*,

11

271 So. 3d at 506 (¶59) (twenty-five-year marriage).

¶23. Third, although alimony should not be awarded as a punishment, "[t]he law is settled that a chancellor *must* consider fault when determining alimony." *Gerty v. Gerty*, 265 So. 3d 121, 133 (¶43) (Miss. 2018) (emphasis added) (citing *Armstrong*, 618 So. 2d at 1280). As discussed above, the Hammonds' marriage ended as a result of Perry's adultery, and there is no evidence of any fault or misconduct on Jenny's part.

¶24. In *Rodrigue*, we found a chancellor's alimony award to be "grossly inadequate" on somewhat similar facts. *Rodrigue*, 172 So. 3d at 1187-89 (¶¶41-46). The parties in that case (Mitch and Deidi) had been married for twenty-three years and had two teenage children. *Id.* at 1188 (¶43). The chancellor awarded physical custody of the children to Deidi. *Id.* Deidi's monthly income, including child support, was roughly $2,400, while Mitch's monthly income was approximately $5,500. *Id.* at 1187 (¶43). The chancellor had granted Deidi a divorce on the ground of uncondoned adultery, although each party blamed the other for the disharmony in the marriage. *Id.* at 1188 (¶43). The chancellor awarded Deidi $50,000 in home equity, $70,000 in retirement funds, and lump-sum alimony of $13,562.41. *Id.* at 1180, 1182, 1185-87 (¶¶15, 17, 33-39, 42). The chancellor found that the Deidi's "income [was] meager compared to Mitch's earnings which . . . [were] roughly four to five times that of Deidi." *Id.* at 1188 (¶44). The chancellor also found that "Deidi [would] lack financial security." *Id.* at 1189 (¶44). Nonetheless, the chancellor denied Deidi's request for periodic alimony. *Id.* at (¶45). On appeal, this Court held that the denial of periodic alimony or additional lump-sum alimony was "unjust and grossly inadequate" and an abuse of discretion.

*Id.* at (¶46). Therefore, we reversed and remanded the case for the chancellor to award periodic alimony or additional lump-sum alimony. *Id.*

¶25. In addition, in *Leblanc*, we reversed a chancellor's "limited award of rehabilitative alimony" as "'unjust'" and "'grossly inadequate.'" *Leblanc*, 271 So. 3d at 507 (¶65) (quoting *Armstrong*, 618 So. 2d at 1280). In that case, the parties (Billy and Christina) had been married for twenty-three years and had four children before Christina filed for divorce on the grounds of Billy's habitual use of illegal drugs, uncondoned adultery, and habitual cruel and inhuman treatment. *Id.* at 498 (¶¶4, 8). At the time of trial, Billy was earning approximately $120,000 per year. *Id.* at 506 (¶58). In contrast, Christina had earned approximately $2,100 per month before she lost her job during trial, which left her dependent on irregular contract work. *Id.* at 499, 501, 506 (¶¶18, 29, 56). The chancellor awarded Christina rehabilitative alimony of $250 per month for eighteen months. *Id.* at 505 (¶53). On appeal, this Court held that the award was "unjust" and "grossly inadequate" given the length of the parties' marriage, the great disparity in their respective incomes, and Christina's inability to meet her basic living expenses on her meager income, which included public assistance. *Id.* at 507 (¶65) (quoting *Armstrong*, 618 So. 2d at 1280).

¶26. The result in this case must be the same as in *Rodrigue* and *Leblanc*. Jenny was out of the workforce for twenty years because the parties decided that she would stay home to care for their children. She has now reentered the workforce as a teacher's assistant, but she makes only $710 per month, and her earning capacity is limited because she lacks a college degree. In contrast, as discussed above, Perry has a far greater earning capacity. At the time

13

of trial, his gross annual income, including his bonus, exceeded $300,000. Indeed, Perry's bonus alone far exceeded what Jenny can hope to earn in a year. In addition to the great disparity in the parties' respective earning capacities, *Armstrong* requires us to consider that the parties' marriage was a long one, that Jenny was out of the workforce for two decades because the parties agreed that she would stay home to care for their children, and that Perry's adultery was the cause of the parties' divorce. Under *Armstrong*, we conclude that the chancellor's award of only two years of rehabilitative alimony is "grossly inadequate." *Armstrong*, 618 So. 2d at 1280. As in *Rodrigue* and *Leblanc*, "we reverse and 'remand the case for further consideration of an appropriate lump-sum or periodic alimony award'" in light of the factors discussed above. *Leblanc*, 271 So. 3d at 507 (¶65) (quoting *Rodrigue*, 172 So. 3d at 1189 (¶46)); *see also Stroh v. Stroh*, 221 So. 3d 399, 414 (¶49) (Miss. Ct. App. 2017) (explaining that lump-sum alimony can "serve a function similar to periodic alimony" and may be awarded "in lieu of periodic alimony, in appropriate cases").

### III. Health Insurance

¶27. Jenny argues that the chancellor erred by ordering Perry to pay for her health insurance for only two years. She argues that with her limited income and limited alimony award, it would be unreasonable to expect her to pay for private health insurance. We cannot say that the chancellor abused her discretion by limiting the duration of Perry's obligation to pay for Jenny's health insurance. However, on remand, the chancellor should consider the cost of health insurance when awarding alimony.

### IV. Attorney's Fees

14

¶28. At trial, Jenny introduced an itemized billing statement from her attorney that showed total attorney's fees of $8,550. However, Jenny had paid her attorney a retainer at the outset of the case, and the billing statement showed a remaining balance of only $3,675. Jenny testified that she was not "financially able to pay . . . for the entire services [her attorney had] rendered to [her] in this case," and she asked the chancellor to order Perry "to pay [her] outstanding . . . fees." But she offered no other evidence in support of her request for fees. The chancellor ultimately denied Jenny's request. On appeal, Jenny argues that the chancellor's ruling was an abuse of discretion.

¶29. "An award of attorney's fees is appropriate in a divorce case where the requesting party establishes an inability to pay." *Gray v. Gray*, 745 So. 2d 234, 239 (¶26) (Miss. 1999). However, the requesting party bears the burden of proving inability to pay. *Vandenbrook v. Vandenbrook*, 292 So. 3d 991, 1004 (¶46) (Miss. Ct. App. 2019). "[I]f a party is financially able to pay an attorney, an award of attorney's fees is not appropriate." *Alford v. Alford*, 298 So. 3d 983, 993 (¶35) (Miss. 2020) (quoting *Gray*, 745 So. 2d at 239 (¶26)). In this case, the only evidence that Jenny offered showed that she owed her attorney $3,675, and in the original equitable division, Jenny was awarded funds sufficient to pay that amount. Therefore, on the record before us, we cannot say that the chancellor abused her discretion by denying Jenny's request for attorney's fees at trial. *Alford*, 298 So. 3d at 993 (¶35).

¶30. "But where we reverse the property division and alimony, the attorney's fees *may* be revisited on remand." *Pierce v. Pierce*, 42 So. 3d 658, 664 (¶27) (Miss. Ct. App. 2010); *accord Lauro v. Lauro*, 847 So. 2d 843, 850 (¶18) (Miss. 2003). Therefore, although the

15

chancellor did not abuse her discretion by denying Jenny's request for attorney's fees, the chancellor may revisit this issue on remand in light of any changes to the property division or additional alimony awarded. *Pierce*, 42 So. 3d at 664 (¶28); *Lauro*, 847 So. 2d at 850 (¶18). In addition, to the extent that Jenny has incurred additional fees subsequent to trial, she may make a new request for fees on remand, which the chancellor should consider together with the issues of equitable division and alimony.

## CONCLUSION

¶31.    We reverse and remand this case for further proceedings consistent with this opinion. On remand, the chancellor must reconsider the equitable division of the marital estate under *Ferguson* after giving appropriate weight to Perry's adultery and its impact on the parties' marriage. The chancellor shall also reconsider Jenny's request for alimony under *Armstrong*, giving appropriate weight to the great disparity in the parties' respective earning capacities, the length of their marriage, Jenny's long absence from the workforce while caring for the parties' children, and Perry's adultery and its impact on the marriage. Finally, although we find no abuse of discretion in the chancellor's ruling on health insurance and attorney's fees, those issues may also be revisited on remand.

¶32.    **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**

16