J-A17013-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| BOUSHRA DAGHESTANI | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AIMAN DAGHESTANI | : | |
| | : | |
| Appellant | : | No. 52 WDA 2018 |

Appeal from the Decree Entered December 7, 2017
In the Court of Common Pleas of Crawford County
Civil Division at No(s):  No. A.D. 2010-695 V

BEFORE:  OTT, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:                          FILED AUGUST 8, 2018

Aiman Daghestani ("Husband") appeals from the decree entered December 7, 2017[1], in the Court of Common Pleas of Crawford County that divorced him and Boushra Daghestani ("Wife") from the bonds of matrimony, distributed the marital assets and debts of the parties, and awarded alimony to Wife.  Husband now challenges the alimony award and the trial court's valuation of two automobiles and of four parcels of real property.  We affirm.

Husband was born in 1950; Wife was born in 1963.  Master's Report and Recommendation ("Report"), 2/24/2017, at 24-25.  The parties were married in 1983 and have six children.  Trial Court Opinion, 12/7/2017, at 1.  Their marital assets include real property in:  Meadville, Crawford County, Pennsylvania ("the Meadville Property"); Pittsburgh, Allegheny County,

_____

[1] The decree in divorce was dated December 6, 2017, but was entered on the docket the following day.

Pennsylvania; and Syria. Decree, 12/7/2017, at ¶ 1.a.-b. The Syrian real property consisted of three parcels – an apartment, a home, and a villa (collectively, "the Syrian Property"). Trial Court Opinion, 12/7/2017, at 10-11. The parties also owned four vehicles: two Mazdas, a Honda, and a Toyota. Decree, 12/7/2017, at ¶ 1.a.-b.

On April 20, 2010, Wife filed for divorce.[2] Wife simultaneously filed a petition for special relief, seeking an injunction against any dissipation, selling, or transferring of marital assets. In June 2010, the trial court held a hearing on the petition for special relief. Husband testified at this hearing that he had purchased the apartment and office together in the 1980s and that his family in Syria was paying the real estate taxes and utility bills for the Syrian Property. N.T., 6/9/2010, at 14, 17-18, 34-35. Husband believed that these actions gave his family in Syria an ownership interest in the Syrian Property but admitted that only his name appeared as owner on any legal documents; he asserted that he was having difficulties reviewing documents due to his recent eye surgery. Id. at 5, 8. Wife confirmed that only Husband was listed as owner of the Syrian Property on any legal documents. Id. at 51. At the

_____

[2] The trial court concluded that this date, April 20, 2010, was also the date of separation for the parties. Trial Court Opinion, 12/7/2017, at 16. As there was conflicting testimony as to the date of separation, id. at 16-17, citing Report at 22-24, N.T., 6/9/2010, at 11, the trial court chose the date that the complaint was filed and served, pursuant to 23 Pa.C.S. § 3103 ("In the event a complaint in divorce is filed and served, it shall be presumed that the parties commenced to live separate and apart not later than the date that the complaint was served."). Husband does not challenge this date, although he does raise claims as to whether he sold certain real estate before or after the parties separated. See Husband's Brief at 39.

conclusion of the hearing, the trial court ordered Husband not to sell the Syrian Property.

Husband defied the court order and, by September 2010, had sold all three parcels to his sister. The record is unclear as to whether the sales price was 85,000 USD or 85,000 Syrian pounds. See, e.g., id. at 23.

On May 25, 2011, Wife obtained an appraisal of the Meadville Property stating that its fair market value was $104,000.00. Wife's Ex. 10.

Following a hearing in May 2012, the trial court held Husband in civil contempt for selling the Syrian Property despite the court order not to do so. The contempt order held that, at the time of equitable distribution, all three parcels of Syrian Property would be categorized as marital property and would be assigned to Husband's share of the marital assets, as he had already received the value of the properties.

In January 2015, a divorce master ("the Master") was appointed to resolve the parties' claims of equitable distribution, alimony, counsel fees, expert fees, costs, and expenses. In anticipation of hearings before the Master, on October 9, 2015, Wife obtained another appraisal of the Meadville Property, which valued it at $163,000.00. Wife's Ex. 11.

The Master held four days of hearings in December 2015, during which Husband was pro se.[3] Husband testified that the Syrian Property "is in poor condition and was affected by the war conducted in the Aleppo area. Husband

_____

[3] Husband is now represented by counsel on appeal.

- 3 -

did not submit any pictures" or other evidence to support his assertion. Trial Court Opinion, 12/7/2017, at 11. Husband also did not provide any specifics about each of the three parcels in the Syrian Property and offered no testimony about the parties' two Mazdas, also located in Syria. See id. at 12, 16, citing Report at 18, 21.

Wife testified extensively about the Syrian Property, including the value of each parcel, when each parcel was purchased, and who resided in each parcel and when; she also gave a general description of each parcel and discussed Husband's sale of the Syrian Property. N.T., 12/1/2015, at 148-190. Wife specifically testified that the apartment was worth 7,000,000 Syrian pounds, the office was worth 5,000,000 Syrian pounds, and the villa was worth 30,000,000 Syrian pounds; she added that the villa had originally cost over $150,000.00 to construct. Trial Court Opinion, 12/7/2017, at 11, citing Report at 15-16.[4] "Wife produced pictures of the [Syrian P]roperty and testified that she resided at the property for a significant period of time. . . . Of the two witnesses that testified regarding the property the Wife had spent more time at the property." Id.; accord Wife's Ex. 37. Wife testified that she had resided in the villa for about nine months per year for approximately fifteen years. N.T., 12/2/2015, at 238. During that time, Husband would

_____

[4] Based on Wife's testimony and using a publically available conversion rate, the Master concluded that the total value of the Syrian Property was $853,788.68 in United States currency. Report at 18. The trial court accepted this calculation. Trial Court Opinion, 12/7/2017, at 12.

reside in Syria for only about one month per year. Id. Albeit that Wife has not returned to the villa since July 2009, her sister also has a villa adjacent to the parties' villa and has informed Wife that the parties' villa is "in one piece" and structurally sound, although the personal property that was within it had been stolen. N.T., 12/1/2015, at 193.[5] Wife provided a translation of the contract of sale from Husband's purchase of the apartment and office in 1987, which listed only Husband as the buyer and not any of his family members. Wife's Ex. 35.[6] Wife further testified that the Mazdas in Syria were valued at $11,400.00 and $18,000.00, for a total of $29,400.00 for both. Report at 21, citing Wife's Ex. 30.

The appraiser of the Meadville Property in both 2011 and 2015 also testified. The appraiser discussed how "the house was in much better condition" when she returned for the 2015 appraisal. N.T., 12/1/2015, at 67. For example, she noted that "a brand-new entry door and front porch area," which gave the property "great curb appeal compared to what it was before." Id. She pointed out the "updated" carpets, floors, and bedroom doors, the addition of a walk-in closet, and the increase of one-and-a-half baths. Id. She specified that "making the half bath into a full bath had probably the biggest significance." Id. at 74. Additionally, she testified that "people are getting a better ratio of rent to sale price" in the area. Id. at 75. Photographs

_____

[5] No objection was made to this testimony. See N.T., 12/1/2015, at 193.

[6] The translation was made by a court-certified translator and was notarized. Wife's Ex. 35.

of the home improvements and lists and receipts of expenses for the improvements were entered into evidence. Wife's Exs. 13 & 14.

During his closing argument, Husband represented that the Mazdas had been destroyed. N.T., 12/4/2015, at 656.

The Master filed his forty-six-page Report in 2017. Report asserted that Wife "appeared to have credible knowledge regarding" the Syrian Property. Report at 16.

Husband filed eight exceptions to Report, all of which the trial court denied on December 6, 2017. On that date, the trial court entered a decree divorcing the parties from the bonds of matrimony, distributing their marital assets and debts, and awarding alimony to Wife. In distributing the marital assets, the trial court calculated that the total value of the Syrian Property was $853,788.68, the value of the Meadville Property was $96,570.00, and the combined value of the two Mazdas was $29,400.00. Decree, 12/7/2017, at ¶ 1.a.-b. The trial court also awarded alimony to Wife "in the monthly amount of $2,700.00 . . . indefinite[ly]." Id. at ¶ 2. On January 2, 2018, Husband filed a notice of appeal.[7]

Husband now raises four issues for our review:

1.      Did the trial court err in valuing the Syrian [P]roperty at $853,788.68 USD based solely on the opinion testimony of Wife,

_____

[7] On January 2, 2018, the trial court ordered Husband to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Husband complied on January 23, 2018. The trial court filed an opinion pursuant to Pa.R.A.P. 1925(a) on January 30, 2018.

who was not an owner of the property and who relied on certain hearsay documents that were excluded from trial?

2.     Did the trial court err in valuing the Meadville [Property] at only $96,570.00, based on a 2011 appraisal, instead of the 2015 appraisal conducted closer to trial indicating a fair market value of $163,000.00 as of October 9, 2015?

3.     Did the trial court err in valuing the Mazda vehicles in Syria at $30,000.00 based on blue book values for these vehicles in the United States, and then assigning them to Husband at that value when Husband, the owner of the vehicles, testified that they had been destroyed due to the war in Syria?

4.     Does the evidence support an award of alimony to Wife of $2,700.00 per month for an indefinite duration pursuant to the statutory factors set forth in 23 Pa.C.S. § 3701?

Husband's Brief at 6-7.

## Syrian Property

Husband first challenges the trial court's valuation of the Syrian Property, raising multiple sub-claims.  Husband's Brief at 17.

Our standard of review in assessing the propriety of a marital property distribution is whether the trial court abused its discretion by a misapplication of the law or failure to follow proper legal procedure.  An abuse of discretion is not found lightly, but only upon a showing of clear and convincing evidence.

Mundy v. Mundy, 151 A.3d 230, 235–36 (Pa. Super. 2016) (citation omitted).

Husband begins by contending that the trial court erred through its "exclusive reliance on Wife's unsubstantiated opinion testimony[.]"  Husband's Brief at 19.  He continues that the trial court "ignored the legal standard of competency that must be met by a non-owner before he or she may provide such testimony on the market value of property."  Id.  Husband cites to a

1934 Supreme Court of Pennsylvania case, Westinghouse Air Brake Co. v.

City of Pittsburgh, 176 A. 13 (Pa. 1934), stating:

> It is well-established under Pennsylvania law that only three types
> of witnesses may provide an opinion on the market value of
> property:  (1) the owner of the property; (2) an expert witness,
> or (3) a person "with knowledge and experience qualifying them
> to form a reasonably intelligent judgment as to value."

Husband's Brief at 19.

Husband's reliance on Westinghouse is misplaced.  Westinghouse is

an over eighty-year-old eminent domain case.  In modern divorce cases, this

Court has held that,

> The Divorce Code does not specify a particular method of valuing
> assets.  Thus, the trial court must exercise discretion and rely on
> the estimates, inventories, records of purchase prices, and
> appraisals submitted by both parties.  When determining the value
> of marital property, the court is free to accept all, part or none of
> the evidence as to the true and correct value of the property.

Biese v. Biese, 979 A.2d 892, 897 (Pa. Super. 2009) (citation and internal

quotation marks omitted).

Additionally, even if we were to rely on Westinghouse, Wife's

testimony would still be permissible.  According to Westinghouse, an owner

may testify as to the market value of a property.  Id., 176 A. at 15 (Pa. 1934).

Wife had an interest in the Syrian Property, as it had already been declared

marital property by the trial court as a sanction after Husband had been held

in contempt for selling the asset after being explicitly ordered by the trial court

not to do so.  Due to Wife's interest in the Syrian Property, even under the

standard of Westinghouse, she was a proper party to testify as to its value.
See id.

Husband further argues that the Master and the trial court should not
have found Wife to be credible:

> The Master's finding that Wife "appeared to have credible
> knowledge regarding the [Syrian P]roperty" cannot be sustained
> in light of clear evidence indicating Wife's specific values for the
> different properties were the same values set forth in an appraisal
> that the Master had excluded from evidence due to the appraiser's
> unavailability to testify at trial. . . . The [trial] court's credibility
> findings in favor of Wife and against Husband reflect a level of
> partiality, prejudice and bias that requires this Court to vacate its
> findings on the Syrian [P]roperty.

Husband's Brief at 29-30.

In essence, Husband is now asking us to reassess the credibility findings
of the Master and the trial court, which is not our prerogative. Credibility is
properly evaluated by the fact-finder – here, the Master and the trial court –
and not by a reviewing court:

> [I]t is within the province of the trial court to weigh the evidence
> and decide credibility and this Court will not reverse those
> determinations so long as they are supported by the evidence.
> We are also aware that a master's report and recommendation,
> although only advisory, is to be given the fullest consideration,
> particularly on the question of credibility of witnesses, because the
> master has the opportunity to observe and assess the behavior
> and demeanor of the parties.

Morgante v. Morgante, 119 A.3d 382, 387 (Pa. Super. 2015); accord Cook
v. Cook, 2018 PA Super 117, ¶ 9 (May 4, 2018). Accordingly, we cannot and

will not substitute our opinion as to the credibility of Wife's knowledge of the Syrian Property.[8]

Furthermore, the evidence presented demonstrated that Wife had significant knowledge of the Syrian Property, which established her credibility. The uncontradicted testimony was that Wife resided in the villa for about nine months per year for approximately fifteen years. N.T., 12/2/2015, at 238. During that time, Husband would reside in Syria for only about one month per year. Id. Albeit that Wife has not returned to the villa since July 2009, her sister also has a villa adjacent to the parties' villa and has informed Wife that the villa is "in one piece" and structurally sound, although the personal property that was within it has been looted. N.T., 12/1/2015, at 193. Wife produced evidence and testified at length that the apartment was worth 7,000,000 Syrian pounds, the office was worth 5,000,000 Syrian pounds, and the villa was worth at least 30,000,000 Syrian pounds; she was also aware of the original cost of construction. Id. at 185; N.T., 12/2/2015, at 265; Trial Court Opinion, 12/7/2017, at 11, citing Report at 15-16. In addition, Wife's testimony regarding the Syrian Property included when each parcel was

_____

[8] Additionally, we are incapable of determining whether Wife's valuation of the Syrian Property was the same as that of her appraiser, because the appraiser's report was not entered into evidence. We cannot consider the content of an exhibit that was not admitted. See Report at 16 ("Wife had the [Syrian P]roperty appraised for the [M]aster's hearing but could not produce the appraiser at the time of hearing. Therefore, the appraisals were not admitted into evidence pursuant to the objection raised by Husband. Wife attempted to offer other documentary evidence regarding costs without success.").

purchased and included a general description of each parcel. N.T., 12/1/2015, at 148-190.

In contrast to Wife's copious testimony and photographic evidence, Husband merely made the bald assertion that the Syrian Property has no value and that the property was destroyed during the war. Husband provided no photographic proof or other corroborating evidence. Trial Court Opinion, 12/7/2017, at 11-12. Although the trial court acknowledged that Husband testified that the Syrian Property was in poor condition after the war, it also noted that "the Master found Husband's testimony less than credible[,]" because the timing of Husband's decision to sell the Syrian Property – i.e., shortly after Wife initiated divorce proceedings – was suspicious. Id. at 11, citing Report at 15-16. The trial court "also note[d] that Husband's failure to abide by [its o]rders relating to the Syrian [P]ropert[y] contributes to [the court's] difficulty in disturbing the credibility findings of the Master." Id. The trial court agreed with the Master that "Husband's testimony was not specific. He could have testified specifically regarding each property." Id. at 12 (emphasis omitted) (quoting Report at 18).

Therefore, we conclude that the trial court did not abuse its discretion in finding that Wife had credible knowledge of the Syrian Property. See Report at 16; see also Mundy, 151 A.3d at 235–36 (abuse of discretion standard of review); Biese, 979 A.2d at 897.

Husband additionally maintains that the Master's "findings that Wife's opinion testimony was sufficiently 'consistent' to support his finding of fair

market value is patently false on its face in light of the record showing Wife to be widely inconsistent in her testimony[,]" insisting:

> At the 2010 hearing, Wife opined that the value of the [Syrian P]roperty at the time of transfer was 40,000,000 Syrian pounds ($853,000.00 USD). At the later trial, however, she changed her testimony and increased the value to 42,000,000 ($911,000.00) as of the same date of transfer. For the trial court to ignore this inexplicable swing of almost $60,000.00 in Wife's testimony . . . amounts to a "manifestly unreasonable judgment[.]"

Husband's Brief at 28 (footnote and citation to the record omitted).

Husband fails to take into account that, over the course of five years, property values could fluctuate and be affected by inflation and exchange rates. Furthermore, we note that the trial court selected the lesser of the two values that Wife presented for the Syrian Property. Even if Wife's testimony were inconsistent, this alleged inconsistency benefited Husband.

Additionally, Husband contends that the trial court "erroneously ignored" that he "owned only a partial interest" in the Syrian Property, "along with other of his family members, including his mother and sister." Id. at 39, citing N.T., 6/9/2010, at 16-25.[9] However, albeit that Husband testified that his family in Syria paid real estate taxes and utility bills for the Syrian Property, N.T., 6/9/2010, at 17, he presented no evidence that any of the three parcels that compose the Syrian Property were "owned" by anyone besides himself. See id. at 16-25. The contract of sale for his purchase of the apartment and office lists only his name as "buyer." Wife's Ex. 35. In

_____

[9] The notes of testimony from the hearing on June 9, 2010, were available to the Master. Report at 4.

fact, both during his testimony and in his brief to this Court, Husband admitted that "title to the [Syrian P]roperty was in his name alone." Husband's Brief at 39; accord N.T., 6/9/2010, at 34-35; see also id. at 51 (Wife confirms that title was in Husband's name alone). Accordingly, Husband's assertion that the trial court erred by failing to consider that he had "only a partial interest" in the Syrian Property is undermined by his own brief. See Husband's Brief at 39.

Finally, Husband maintains that the trial court also erred in calculating the value of the Syrian Property, because it "was sold prior to separation." Id. Nevertheless, Husband presents no evidence to support his bald assertion in his brief that the Syrian Property was actually sold prior to the parties' separation; his brief also does not direct this Court to any place in the certified record where evidence of his averment can be found. Id. at 39, 41.

For these reasons, we conclude that none of Husband's challenges to the trial court's valuation of the Syrian Property have merit, and the trial court did not abuse its discretion in valuing the Syrian Property. See Mundy, 151 A.3d at 235–36 (abuse of discretion standard of review).

Meadville Property

The trial court held that there was never any question that the Meadville Property was a marital asset and that improvements to the property were made post-separation by Wife. Trial Court Opinion, 12/7/2017, at 13. The trial court thereby reasoned that Husband was not entitled to the increased value of the Meadville Property between the 2011 and 2015 appraisals. Id.

After subtracting the costs of sale and "splitting the deed preparation" from the 2011 appraisal value of $104,000.00, the trial court calculated that the "marital value" of the Meadville Property was $97,500.00. Id.; see also Wife's Ex. 10.

Husband now challenges the trial court's valuation of the Meadville Property "at only $96,570.00 when Wife's own appraiser testified that it had a fair market value of $163,000.00 at the time of trial." Husband's Brief at 41. Husband additionally contends that Wife's appraiser testified that the increase in the value of the Meadville property was due to general market conditions in the area and not to Wife's improvements. Id. at 44.

Our standard of review remains the same – i.e., an abuse of discretion. Mundy, 151 A.3d at 235–36.

"In determining the value of marital assets, a court must choose a date of valuation which best works economic justice between the parties. The same date need not be used for all assets." Smith v. Smith, 904 A.2d 15, 18–19 (Pa. Super. 2006).

Accordingly, it was within the trial court's powers and discretion to choose the 2011 appraisal value of the Meadville Property and not the 2015 appraisal of the Meadville Property. See Smith, 904 A.2d at 18-19. The trial court explained that the 2011 valuation best works economic justice between the parties, because all of the improvements to the Meadville Property were performed post-separation by Wife. Trial Court Opinion, 12/7/2017, at 13; see Smith, 904 A.2d at 18-19.

Additionally, Husband's contention that Wife's appraiser testified that the increase in the value of the Meadville property was due to general market conditions in the area and not to Wife's improvements, Husband's Brief at 44, is defied by the record. According to the appraiser, the Meadville Property was "in much better condition" when she evaluated it in 2015, versus her previous appraisal in 2011. N.T., 12/1/2015, at 67. She specifically mentioned: the addition of a walk-in closet; the increase of one-and-a-half; baths; the "updated" carpets, floors, and bedroom doors; and the "brand-new entry door and front porch area," which she described as giving the property "great curb appeal [compared] to what it was before." Id. She testified that "making the half bath into a full bath had probably the biggest significance." Id. at 74. Furthermore, she did not say that sales values in the area had increased but that "people are getting a better ratio of rent to sale price" in the area. Id. at 75. Consequently, Husband's claims about Wife's appraiser's testimony are not supported by the record.

For these reasons, the trial court did not abuse its discretion in valuing the Meadville Property at $96,570.00. See Mundy, 151 A.3d at 235–36 (abuse of discretion standard of review).

Mazdas

Husband's next claim is that "[t]he [t]rial [c]ourt erred in valuing the Mazda vehicles in Syria at $30,000.00, based on the blue book values in the United States as of the date of separation, and then assigning them to

Husband even though they had been destroyed by the time of trial." Husband's Brief at 47.

Our standard of review remains the same – i.e., an abuse of discretion. Mundy, 151 A.3d at 235–36.

We begin by noting that the trial court valued the two Mazdas at $29,400.00 total, not $30,000.00, as Husband alleges. Decree, 12/7/2017, at ¶ 1.b. The trial court based this valuation on Wife's testimony that the Mazdas were valued at $11,400 and $18,000. Trial Court Opinion, 12/7/2017, at 16. The trial court and the Master found Wife's testimony to be credible, id., citing Report at 21, and, again, this Court cannot reverse those credibility determinations so long as they are supported by the evidence. Morgante, 119 A.3d at 387; Cook, 2018 PA Super 117, ¶ 9.

Conversely, Husband offered no testimony as to the value of the Mazdas. Trial Court Opinion, 12/7/2017, at 16. More importantly, Husband did not testify that the Mazdas were destroyed; rather, during his closing argument, not his testimony, he represented that the vehicles were destroyed. N.T., 12/4/2015, at 656. Even if Husband's representation during closing arguments that the Mazdas had been destroyed were accepted as evidence, Husband still failed to give a date as to when the Mazdas were demolished, and the trial court still would have been free to "choose a date of valuation which best works economic justice between the parties," Smith, 904 A.2d at 18–19, which could have been prior to their alleged destruction.

For all these reasons, the trial court did not abuse its discretion in valuing the two Mazdas. Mundy, 151 A.3d at 235–36 (abuse of discretion standard of review).

## Alimony

Husband's final issue is that "the trial court erred in awarding alimony to Wife" in the amount of "$2,700.00 per month for an indefinite period of time," because "[a] court may award alimony only when it finds that alimony is 'necessary.'" Husband's Brief at 49, citing 23 Pa.C.S. § 3701(a). Husband contends that such alimony was not necessary and that the trial court improperly "relied only on factors 1, 2, 3, 5, 7, 9 and 17 of § 3701(b)." Husband's Brief at 49, citing 23 Pa.C.S. § 3701(b)(1)-(3), (5), (7), (9), (17).[10] Husband particularly argues that the trial court should have given some "weight" to subsection (b)(16) and "consideration" to his age. Id. at 50-51.

"Our standard of review over an alimony award is an abuse of discretion." Gates v. Gates, 933 A.2d 102, 106 (Pa. Super. 2007).

The aforementioned Section 3701(b) of the Divorce Code states:

In determining whether alimony is necessary and in determining the nature, amount, duration and manner of payment of alimony, the court shall consider all relevant factors, including:

(1) The relative earnings and earning capacities of the parties.

(2) The ages and the physical, mental and emotional conditions of the parties.

_____

[10] See below for the full text of 23 Pa.C.S. § 3701(b).

(3) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits.

(4) The expectancies and inheritances of the parties.

(5) The duration of the marriage.

(6) The contribution by one party to the education, training or increased earning power of the other party.

(7) The extent to which the earning power, expenses or financial obligations of a party will be affected by reason of serving as the custodian of a minor child.

(8) The standard of living of the parties established during the marriage.

(9) The relative education of the parties and the time necessary to acquire sufficient education or training to enable the party seeking alimony to find appropriate employment.

(10) The relative assets and liabilities of the parties.

(11) The property brought to the marriage by either party.

(12) The contribution of a spouse as homemaker.

(13) The relative needs of the parties.

(14) The marital misconduct of either of the parties during the marriage. The marital misconduct of either of the parties from the date of final separation shall not be considered by the court in its determinations relative to alimony, except that the court shall consider the abuse of one party by the other party. As used in this paragraph, "abuse" shall have the meaning given to it under section 6102 (relating to definitions).

(15) The Federal, State and local tax ramifications of the alimony award.

(16) Whether the party seeking alimony lacks sufficient property, including, but not limited to, property distributed under Chapter 35 (relating to property rights), to provide for the party's reasonable needs.

(17) Whether the party seeking alimony is incapable of self-support through appropriate employment.

23 Pa.C.S. § 3701(b). "To determine whether alimony is necessary and to establish the appropriate nature, amount, and duration of any alimony payments, the court is required to consider all relevant factors, including the 17 factors that are expressly mandated by statute." Lawson v. Lawson, 940 A.2d 444, 447 (Pa. Super. 2007) (emphasis in original); accord Cook, 2018 PA Super 117, ¶ 8.

Contrary to Husband's contention, Husband's Brief at 49, the trial court and the Master did not rely "only" on specific enumerated factors from 23 Pa.C.S. § 3701(b) – they just "relied" on those factors "most heavily[.]" Trial Court Opinion, 12/7/2017, at 13, citing Report at 41. There is nothing in the record to suggest that the trial court and the Master did not consider all relevant factors, and, in fact, the trial court explicitly stated in its opinion that, "[t]o determine the alimony award, the Master properly evaluated all of the requisite factors set forth in 23 Pa.C.S. [§] 3701(b)." Trial Court Opinion, 12/7/2017, at 13 (emphasis added). The trial court adopted the Master's conclusions about the Section 3701(b) factors, because it was "satisfied that the record support[ed] the Master's determination[.]" Id.

As for subsection (b)(16) in particular, see Husband's Brief at 50, while Husband is correct that "alimony following a divorce is a secondary remedy and is available only where economic justice and the reasonable needs of the parties cannot be achieved by way of an equitable distribution award and development of an appropriate employable skill," Leicht v. Leicht, 164 A.3d

1246, 1248 (Pa. Super. 2017); accord Cook, 2018 PA Super 117, ¶ 9, the

Report makes it clear that the Master thoroughly considered Wife's

"reasonable needs" in light of the property distribution, 23 Pa.C.S.

§ 3701(b)(16):

> The marital estate is in the millions. Wife is receiving significant assets and she is receiving over $1,000,000.00 in investment accounts. It is reasonable to assume that these accounts can generate income to the Wife without the necessity of reducing the principal amount invested. Evidence was not submitted as to what that might be.
>
> It is understood that investments with a fixed rate of return currently generate smaller returns. To net $5,000.00 in monthly income the Wife would need a return of something in excess of 7% on her investments. Whether that is feasible is not known. To expect that Wife can generate $2,000.00 a month after taxes is reasonable. To expect that Wife would generate enough to meet her budget shortfall is speculation.
>
> Wife also is receiving significant value in retirement accounts. However, she will not be able to access those accounts until she is 59 1/2 years of age. . . .
>
> Alimony is based upon the reasonable needs of a party, who is unable to support himself or herself through appropriate employment, in accordance with the lifestyle and standard of living established by the parties during the marriage, as well as the payor's ability to pay. . . .
>
> The real issue is the impact of the distribution of property award. Wife needs to preserve as much of the property distribution as she can since she does not have the ability to add earned income to it. It must last for the remainder of her life. Nor will she be able to grow her retirement accounts via contributions and she is not currently eligible to withdraw from the retirement accounts. She will need to make use of some of the principal to pay off post separation debt including attorney's fees. However, she should have in excess of $1,000,000.00 to invest to generate income. There is not sufficient evidence that the income generated from the investment accounts will override her shortfall.

. . .

> There was some consideration of increasing the distribution of property amount to Wife and not awarding alimony. This scheme was chosen because the undersigned does not know how long the Husband will be able to maintain employment. Husband is at an age where there are greater risks. The undersigned is concerned that if Husband was divested of more investment account and retirement account income he would be in a difficult position should he have a health issue that caused retirement such as a worsening of his eye issues. While Husband is working he should not have difficulty in paying the alimony awarded.

Report at 39-41 (citation omitted).

The Master further took Husband's age into consideration by incorporating his previous analysis for the division of property, id. at 36, which noted:

> At the time of the hearing the Husband was 65 years of age. . . . Husband appears to be in good physical, mental, and emotional health. He has a history of eye problems requiring surgery. It is not clear how long Husband plans to work in the future considering his advanced age.

Id. at 25.[11]

The trial court agreed with and adopted these observations and assessments by the Master, "find[ing] that the Master's award of alimony effectuates economic justice between the parties and see[ing] no reason to disturb the Master's findings." Trial Court Opinion, 12/7/2017, at 13; see Leicht, 164 A.3d at 1248; see also Cook, 2018 PA Super 117, ¶ 9.

_____

[11] Although the specific heading was not directly referenced in the section of the Report about alimony, the Report's analysis of equitable distribution also stated: "Another factor that supports Husband is his age. He is nearing retirement." Report at 32. Accordingly, the Master was indubitably aware of Husband's age and his proximity to retirement.

Husband's argument consequently is meritless, and the trial court did not abuse its discretion in awarding alimony to Wife in the amount of $2,700.00 per month. See Gates, 933 A.2d at 106 (abuse of discretion standard of review).

For the reasons given above, we find that the trial court did not abuse its discretion when valuing the Syrian Property, the Meadville Property, and the two Mazdas nor in awarding alimony to Wife in the amount of $2,700.00 per month. See Mundy, 151 A.3d at 235–36 (abuse of discretion standard of review); See Gates, 933 A.2d at 106. See also 23 Pa. C.S.A. § 3701(e) (alimony is modifiable upon a change in circumstances). We consequently affirm the trial court's decree entered December 7, 2017.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/8/2018